1  NICHOLAS J.P. WAGNER
   California State Bar No. 109455
2  THE WAGNER LAW GROUP
   1111 E Herndon Ave. Suite 317
3  Fresno, CA 93720
   Tel.: (559) 449-1800
4  butch@thewagnerlawgroup.com

5  *Counsel for Plaintiffs*

6

   **UNITED STATES DISTRICT COURT**
7  **NORTHERN DISTRICT OF CALIFORNIA**
   **SAN FRANCISCO DIVISION**
8

9  GERALDINE HILL; NICHOLE           CASE NO.
   ROBINSON; and CHAROLLETTE
10 ALARCON, individuals,             **COMPLAINT**

11          Plaintiffs,              • Violation of Eighth Amendment
        v.                           • Sexual Battery
12                                   • Gender Violence
   UNITED STATES OF AMERICA;         • Civil Conspiracy
13 FEDERAL BUREAU OF PRISONS;        • Battery
   FEDERAL CORRECTIONAL              • Negligence
14 INSTITUTION-DUBLIN; OFFICER
   ESPINOSA; OFFICER RAMOS;
15 OFFICER SALCIDO; OFFICER          JURY TRIAL DEMANDED
   SMITH; and DOES 1 to 20.
16
            Defendants.
17

18

19

20

                              COMPLAINT

**THE PARTIES**

1.     Plaintiff Geraldine Hill is an individual residing in the State of California. During the relevant period, she was in the custody of the Federal Bureau of Prisons in whose care she was incarcerated at Federal Correctional Institution-Dublin in Dublin, California. Plaintiff Chaney is presently out of custody and not incarcerated or detained in any facility.

2.     Plaintiff Nichole Robinson is an individual residing in the State of California. During the relevant time period, she was in the custody of the Federal Bureau of Prisons in whose care she was incarcerated at Federal Correctional Institution-Dublin in Dublin, California. Plaintiff Robinson is presently out of custody and not incarcerated or detained in any facility.

3.     Plaintiff Charlotte Alarcon is an individual residing in the State of California. During the relevant time period, she was in the custody of the Federal Bureau of Prisons in whose care she was incarcerated at Federal Correctional Institution-Dublin in Dublin, California. Plaintiff Alarcon is presently out of custody and not incarcerated or detained in any facility.

4.     Defendant Federal Bureau of Prisons (BOP) is government agency headquartered in Washington D.C under the U.S. Department of Justice. Defendant BOP is responsible for the care, custody, and control of federal prisoners and the operation and management of federal correctional institutions. On information and belief: Defendant BOP knew or should have known of the individual defendants' past histories, proclivities, and propensities for threats, violence, sexual abuse, harassment, retaliation, misuse of authority, and prior violations of BOP policies, procedures, rules, and regulations and Defendant BOP permitted, consented to, and/or ratified their conduct individually and collectively.

5.     Defendant Federal Correctional Institution-Dublin (FCI Dublin) is a low-security facility that houses female inmates and operates under the control of

its supervising agency, Defendant BOP. It is located in Dublin, California which is within the federal judicial district for the Northern District of California.

6.    Defendant United States of America (USA) is a government entity. During the relevant period, the United States, by and through its federal agency BOP, held possession of and exercised control over FCI Dublin. The United States has waived sovereign immunity to Plaintiffs' tort claims. 28 U.S.C. §2674; *cf. id.* at §2680(h).

7.    On information and belief: Defendant Officer Espinosa, first name unknown, is an individual who lives and resides in the State of California. During the relevant period, he was employed by BOP and working at FCI Dublin as a law enforcement officer. With respect to the allegations in this complaint, he acted under color of authority while employed as a correctional officer and Defendants USA and BOP permitted, consented to, and/or ratified his conduct. Plaintiffs will amend this complaint to state Defendant Espinosa's full name when ascertained.

8.    On information and belief: Defendant Officer Ramos, first name unknown, is an individual who lives and resides in the State of California. During the relevant period, he was employed by BOP and working at FCI Dublin as a law enforcement officer. With respect to the allegations in this complaint, he acted under color of authority while employed as a correctional officer and Defendants USA and BOP permitted, consented to, and/or ratified his conduct. Plaintiffs will amend this complaint to state Defendant Ramos's full name when ascertained.

9.    On information and belief: Defendant Officer Salcido, first name unknown, is an individual who lives and resides in the State of California. During the relevant period, he was employed by BOP and working at FCI Dublin as a law enforcement officer. With respect to the allegations in this complaint, he acted under color of authority while employed as a correctional officer and Defendants

USA and BOP permitted, consented to, and/or ratified his conduct. Plaintiffs will amend this complaint to state Defendant Salcido's full name when ascertained.

10.     Plaintiffs are ignorant of the identities of DOES 1 through 20, inclusive, and therefore sue them under fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained. On information and belief: DOES 1 through 20, individually and/or collectively, were responsible for the occurrences alleged herein and their acts or omissions were a proximate cause of Plaintiffs' injuries. References in this complaint to the "Defendants" include DOES 1 through 20 unless otherwise stated. While the Federal Code of Civil Procedure does not reference DOE defendants, their use here is appropriate given the extent of the collusion and cover-up of abuse at FCI Dublin which by its nature acted to conceal the identities of those responsible for misconduct against Plaintiffs.

11.     During the relevant period, Defendants were agents, employees, partners, joint-venturers, conspirators, owners, principles and/or employers of one another, and acted within the course and scope of such relationships. Each defendant's conduct was known, authorized, permitted, and/or ratified by the other defendants, individually and collectively.

### JURISDICTION & VENUE

12.     Diversity jurisdiction exists under 28 U.S.C. §1332 because Plaintiffs and Defendants have diversity of citizenship and the amount in controversy exceeds $75,000.

13.     Federal question jurisdiction exists under 28 U.S.C. §1331 over Plaintiffs' constitutional claims under the U.S. Constitution and related federal statutes, and their federal tort claims under the Federal Tort Claims Act.

14.     Supplemental jurisdiction exists under 28 U.S.C. §1367 over Plaintiffs' state law claims arising from California statutory, common law, and

COMPLAINT

constitutional authority as they are predicated on the same operative facts giving rise to Plaintiffs' federal-question claims.

15.    Personal jurisdiction exists because Defendants, as pleaded on information and belief, live and reside in the State of California. Specific jurisdiction exists because Defendants committed the acts and omissions at issue in this case within the State of California.

16.    Venue is proper in this judicial district under 28 U.S.C. §§1391(b)(2) and 1402(b) because the conduct giving rise to Plaintiffs' claims occurred at FCI Dublin in Dublin, California. Assignment is proper to the San Francisco Division of the Northern District of California because the conduct giving rise to Plaintiffs' claims occurred at FCI Dublin which is located in Alameda County, California.

<strong>GENERAL ALLEGATIONS</strong>

17.    **As to FCI Dublin generally:**

a.    FCI Dublin has a well-documented history of sexual abuse, retaliation, conspiracy, and cover-up by prison employees against the female inmates housed there. This culture of abuse stemmed from the very top and pervaded down the ranks to every facet of operations and has been the subject of investigations by reputable media outlets, federal agencies, and at least one congressional sub-committee.

b.    On February 6, 2022, for example, AP News reported: "Inside one of the only federal women's prisons in the United States, inmates say they have been subjected to rampant sexual abuse by correctional officers and even the warden, and were often threatened or punished when they tried to speak up. [¶] Prisoners and workers at the federal correctional institution in Dublin, California, even have a name for it: 'The rape club.' [¶] An Associated Press investigation has found a permissive and toxic culture at the Bay area lockup, enabling years of sexual misconduct by predatory employees and cover-ups that have largely kept the abuse

out of the public eye. [¶] The AP obtained internal Bureau of Prisons documents, statements and recordings from inmates, interviewed current and former prison employees and reviewed thousands of pages of court records from criminal and civil cases involving Dublin Prison staff. [¶] Together, they detail how inmates' allegations against members of the mostly male staff were ignored or set aside, how prisoners could be sent to solitary confinement for reporting abuse and how officials in charge of preventing and investigating sexual misconduct were themselves accused of abusing inmates or neglecting their concerns." Michael Balsamo and Michael R. Sisak, *AP investigation: Women's prison fostered culture of abuse*, AP News, February 6, 2022, https://apnews.com/article/prisons-california-united-states-sexual-abuse-only-on-ap-d321ae51fe93dfd9d6e5754383a95801.

      c.    On August 31, 2022, the Office of Public Affairs for the Department of Justice issued a press release stating: "James Theodore Highhouse, 50, a former chaplain with the Federal Bureau of Prisons (BOP) was sentenced today in federal court… to 84 months in prison followed by five years of supervised released[sic] for repeatedly sexually abusing an incarcerated female and then lying to federal agents about his misconduct… [¶] Highhouse previously entered a guilty plea to five felonies on Feb. 23, 2022. According to court documents, Highhouse was employed by the BOP as a corrections worker and chaplain starting in 2016, and was assigned to work at [FCI Dublin]…. At times, Highhouse also performed a custodial role, that is, he could handcuff inmates, write up incident reports and refer inmates for disciplinary action. [¶] In imposing sentence, the judge considered the defendant's systemic abuse of the victim as well as the accounts of other women whom the defendant subjected to sexual misconduct. The judge specifically noted the defendant's 'sustained predatory behavior against traumatized and defenseless women in prison.' " U.S. Department of Justice, Office of Public Affairs, *Federal Prison Chaplain Sentenced for Sexual Assault and Lying to Federal*

*Agents*, August 31, 2022, https://www.justice.gov/opa/pr/federal-prison-chaplain-sentenced-sexual-assault-and-lying-federal-agents.

  d. On September 29, 2022, the San Francisco Chronicle reported: "A former guard at the federal women's prison in Dublin was charged Thursday with sexually abusing two more inmates, the latest in a series of sex-abuse charges against officers and a former warden at the Federal Correctional Institution. [¶] John Bellhouse was initially indicted… in February on a charge of abusive sexual contact with a female inmate in 2020, and pleaded not guilty. In Thursday, the grand jury issued a new indictment accusing Bellhouse, 39, of two additional charges of abusing the same woman, between December 2019 and October 2020, and three more charges of touching the thighs and buttocks of two other female prisoners in 2020." Bob Egelko, *Sex abuse charges against former Dublin prison guard are the latest in a string of serious incidents*, September 29, 2022, https://www.sfchronicle.com/bayarea/article/Sex-abuse-charges-against-former-Dublin-prison-17476669.php.

  e. On October 27, 2022, the U.S. Attorney's Office issued a press release that stated: "Enrique Chavez pleaded guilty in federal court today to abusive sexual contact with a female prison inmate while he was employed as a correctional officer at [FCI Dublin] in Alameda County. [¶¶¶] Chavez admitted today in his plea agreement that during October 2020 he met Victim 1 in the food service pantry at FCI Dublin. After they met in the pantry, Chavez locked the door. The lights were turned off. Chavez admitted to putting his hand inside Victim 1's underwear and touching her genitals. Chavez also admitted to touching the victim's breasts. [¶] Chavez pleaded guilty today to one count of abusive sexual contact with a prisoner in violation of 18 U.S.C. § 2244(a)(4)." U.S. Attorney's Office, Northern District of California, *Former Correctional Officer Admits to Abusive Sexual Contact with*

*Inmate*, October 27, 2022, https://oig.justice.gov/sites/default/files/2022-10/10-27-2022.pdf.

      f.    Chavez had previously been identified as a correctional officer who "supervised and had disciplinary authority over the female inmates incarcerated at FCI Dublin. Chavez was trained in BOP policies and procedures, which included instructions that sexual, financial and social relationships with inmates are prohibited." U.S. Department of Justice, Office of Public Affairs, *Correctional Officer at FCI Dublin Charged for Abusive Sexual Contact with Female Inmate*, March 23, 2022, https://oig.justice.gov/sites/default/files/2022-04/03-23-2022.pdf.

      g.    On December 8, 2022, the Office of Public Affairs for the Department of Justice issued another press release that stated: "A federal jury convicted former prison warden Ray J. Garcia of seven counts involving sexually abusive conduct against three female victims who were serving prison sentences and one count of making false statements to government agents. [¶] Garcia, 55, of Merced, California, was initially charged with sexual abuse of an inmate on Sept. 24, 2021. A federal grand jury issued a superseding indictment on Aug. 23, 2022, charging Garcia with three counts of sexual abuse and four counts of abusive sexual contact against three female inmates. The criminal acts were alleged to have occurred from December 2019 to July 2021." U.S. Department of Justice, Office of Public Affairs, *Jury Convicts Former Federal Prison Warden for Sexual Abuse of Three Female Inmates*, December 8, 2022, https://www.justice.gov/opa/pr/jury-convicts-former-federal-prison-warden-sexual-abuse-three-female-inmates.

      h.    On December 13, 2022, the Inspector General for the Department of Justice published a copy of his remarks to the U.S. Senate Committee on Homeland Security and Government Affairs, Permanent Subcommittee on Investigations concerning "Sexual Abuse of Female Prisoners in the Custody of

the Federal Bureau of Prisons," which stated: "The OIG's oversight authority includes wrongdoing by BOP personnel who are accused of sexually assaulting inmates. There is no clearer reminder of the importance of our work than the testimony we heard from Ms. Delarosa, Ms. Moore, and Ms. Richardson…. Indeed, just last week, a jury in California convicted the former Warden at [FCI Dublin], which prompted my office, working with the FBI and the U.S. Attorney's Office… to conduct a widespread sexual misconduct investigation at the prison." Statement of Michael E. Horowitz, Inspector General, December 12, 2022, at 1, https://oig.justice.gov/sites/default/files/2022-12/12-13-2022.pdf. "[T]he OIG, in partnership with the FBI and the USAO, has an ongoing investigation of alleged widespread sexual assaults between 2018 and 2021 by numerous BOP officials against inmates at FCI Dublin, an all-female prison in California. To date, our ongoing investigation has resulted in 5 employees at FCI Dublin being charged criminally, including the former warden who just last week was convicted by a jury on 8 separate charges, including multiple counts of sexual abuse, illegal sexual contact with inmates, and lying to investigators." *Id.* at 3.

   i. Also on December 13, 2022, the Permanent Subcommittee on Investigations for the U.S. Senate released a report in conjunction with its hearing that day that stated: "FCI Dublin is an all-female facility with two components: a low security federal correctional institution and an adjacent minimum-security satellite camp. There are currently 477 female offenders housed across the prison." U.S. Senate, Permanent Subcommittee on Investigations, Staff Report, December 13, 2022, at 15, footnotes omitted, https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-12-13%20PSI%20Staff%20Report%20-

%20Sexual%20Abuse%20of%20Female%20Inmates%20in%20Federal%20Prisons.pdf.[1]

       j.     The staff report stated five employees had been indicted "for sexual abuse of at least eight female detainees at FCI Dublin." *Id.* These included (1) Ross Klinger, a former BOP correctional officer and recycling technician who was indicted in June 2021 and subsequently "pleaded guilty to three counts of sexual abuse of a ward." *Id.* at 15-16. (2) Ray J. Garcia, the former warden, who was charged with having "knowingly had sexual contact with at least one female prisoner, asked at least two inmates to strip naked for him during rounds and took photos, and stored a 'large volume of sexually graphic photographs' on his BOP issued cellphone. In the two years prior to his arrest, Garcia was the PREA compliance officer at FCI Dublin, responsible for ensuring that the facility was adhering to PREA policies and training other employees, including new supervisors." *Id.* at 16. (3) John Bellhouse, a correctional officer and safety administrator, who was charged with sexual abuse of a prison ward after "a prisoner identified that Bellhouse and another BOP employee were engaging in sexual interactions with several prisoners, and also providing prisoners with contraband, money and personal cellphone use." *Id.* (4) James Highhouse, a former chaplain, who pleaded guilty after being charged with sexual abuse of a ward, abusive sexual contact, and making false statements to investigators." *Id.* And finally (5), "Enrique Chaves, a food service foreman… was indicted on two counts of abusive sexual contact with a prison inmate." *Id.* The staff report further stated: "As of May 2022, OIG and/or BOP were investigating at least 17 additional current or former employees at FCI Dublin for sexual misconduct." *Id.*

---

[1]    Due to their voluminous nature, footnotes are omitted from the quoted portions of the Subcommittee's staff report dated December 13, 2022. Future references to the staff report should be understood to have footnotes omitted.

COMPLAINT

k.      In all, the Subcommittee identified at least 19 female prisoners who were sexually abused by BOP employees at FCI Dublin from 2012 to 2022. This list was determined by tallying cases where a male BOP employee pleaded guilty or was convicted of sexually abusing a female prisoner and cases where BOP OIA substantiated allegations of sexual abuse by male BOP employees. *Id.* at Exhibit 1 at 1-2.

l.      Most recently, on April 6, 2023, The Guardian reported on a particular case for an inmate named Cristal who was pursuing a case against BOP: "When Cristal arrived at FCI Dublin in September 2019, guards put her to work as a cook. She was grateful for the job… But almost immediately, an officer overseeing the kitchen began harassing her, she said, pressuring her to go to the backroom where there were no cameras; threatening to expose himself; rubbing and grabbing her from behind; demanding she 'bend over'; and calling her demeaning names when she refused." Sam Levin, *She reported being abused by US prison guards. Now she faces deportation*, The Guardian, April 6, 2023, https://www.theguardian.com/us-news/2023/apr/06/federal-prison-sexual-abuse-deportation-california-mexico. "Cristal's nightmare is not an anomaly, but a common experience across the Federal Correctional Institution (FCI), east of San Francisco. Indictments against five officers show that guards systemically victimized women in their custody, intimidated them into silence, [and] lied to cover up crimes." *Id.*

18.      **As to the Prison Rape Elimination Act (PREA):**

a.      The Prison Rape Elimination Act Standards are codified in 28 C.F.R. §115.5 *et seq.* and set forth extensive requirements for BOP with respect to the prevention, detection, and response to "all forms of sexual abuse and sexual harassment." 28 C.F.R. §115.11(b), (c).

b.    Sexual assault is defined as "Any… intentional contact, either directly or through the clothing, of or with the genitalia, anus, groin, breast, inner thigh, or the buttocks, that is unrelated to official duties…" or "Any attempt, threat, or request to engage in [such activity]" 28 C.F.R. §115.6. Sexual harassment is defined as repeated gestures of a sexual nature to an inmate by a staff member including obscene language or gestures. *Id.*

c.    PREA's requirements include mandatory reporting duties for all staff to immediately report "any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility, whether or not it is part of the agency; retaliation against inmates or staff who reported such an incident; and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation." *Id.* at §115.61(a). "The facility shall report all allegations of sexual abuse and sexual harassment, including third-party and anonymous reports, to the facility's designated investigators." *Id.* at §115.61(e).

d.    PREA's requirements also include mandatory protection duties. "When an agency learns that an inmate is subject to a substantial risk of imminent sexual abuse, it shall take immediate action to protect the inmate." *Id.* at §115.62. In addition to acting to ensure an inmate's physical safety, BOP is required to affirmatively protect from retaliation "all inmates and staff who report sexual abuse or sexual harassment or cooperate with sexual abuse or sexual harassment investigations from retaliation by other inmates or staff" and "shall employ multiple protection measures" to do so. *Id.* at §115.67(a), (b).

e.    Transfer to the Special Housing Unit is not an appropriate measure to protect an inmate from sexual assault, sexual harassment, or retaliation unless no other methods are available to ensure their safety. "Inmates at high risk for sexual victimization shall not be placed in involuntary segregated housing unless an assessment of all available alternatives has been made, and a

determination has been made that there is no available alternative means of separation from likely abusers." *Id.* at §115.43(a).

   f. "PREA 'is intended to make confinement facilities free from sexual abuse and its threat.' When Congress passed PREA in 2003, it established a National Prison Rape Elimination Commission (the 'NPRE Commission') to 'carry out a comprehensive legal and factual study of the penological, physical, mental, medical, social, and economic impacts of prison rape' and to issue a report with 'recommended national standards for reducing prison rape[.]' The recommendations, adopted by DOJ and binding on BOP, require periodic PREA audits of all federal correctional facilities to ensure compliance with the standards put forth in the regulations. According to DOJ, PREA auditors 'are responsible for conducting high quality, reliable, objective, and comprehensive audits that hold agencies and facilities accountable for keeping individuals in their custody and care safe from sexual abuse and sexual harassment.' " U.S. Senate, Permanent Subcommittee on Investigations, Staff Report, *supra*, at 19.

   g. "PREA audits assess whether an institution is compliant with the 45 PREA standards by reviewing policies and practices within the institution, interviewing employees and prisoners, and reviewing documentation from the audit period, such as prisoner complaints of sexual abuse or harassment." *Id.* at 19-20.

   h. The Permanent Subcommittee on Investigations reviewed the PREA audits of "FCI Dublin—where there were, per BOP OIA Chief Reese, 'cultural issues' concerning sexual misconduct by employees—to evaluate whether the audits detected that there was a sexual abuse problem. In other words, did the PREA audits predating and during the period of multiple BOP employees abusing multiple women find that the prison was not compliant with some or all of the PREA standards? Did the audits covering the periods of significant sexual abuse detect the cultural issues at that prison? [¶] The Subcommittee found that BOP failed to

accomplish either outcome with its PREA audits." *Id.* These audits all "came back clean" and found that FCI Dublin was "compliant with all PREA standards before, during, and after the multiple, documented instances of sexual abuse." *Id.* at 20.

      i.    As to the 45 PREA standards: The 2014 audit report found that FCI Dublin had met or exceeded 42 standards and that one standard was not applicable; it is unclear what two standards were not included in the results. The 2017 audit found that FCI Dublin had met 42 standards and that two standards were not applicable; it is unclear which standard was not included in the results. The 2022 audit found that FCI Dublin had met all 45 PREA standards. *Id.* at 21.

      j.    Upon consideration of written documentation and testimonial evidence regarding PREA compliance, the Subcommittee concluded: "BOP failed to detect or prevent sexual abuse of incarcerated women by male BOP employees. The agency's poor implementation of the audit program and reporting mechanisms required by PREA allowed serious, repeated sexual abuse in at least four facilities [including FCI Dublin] to go undetected. BOP's internal affairs practices have failed to hold employees accountable, and multiple admitted sexual abusers were not criminally prosecuted as a result. Further, for a decade, BOP failed to respond to this abuse or implement agency-wide reforms." *Id.* at 30.

      k.    Throughout the relevant time period, Defendants continually violated PREA Standards and acted in concert to conceal their misconduct.

    19.    **As to Plaintiff Geraldine Hill:**

      a.    Plaintiff Hill suffered sex-based harassment, abuse, retaliation, and discrimination during her incarceration at FCI Dublin beginning on January 27, 2021 through her release on or about June 23, 2021. On information and belief, she knew the facts stated in ¶¶17 and 18 before, during, and/or after the harms she suffered as described in this paragraph.

b.      While incarcerated, Plaintiff Hill was housed in Unit B. Her room was a few feet away from the duty officer desk. Her room had a window, which she covered for privacy when she was using the toilet or changing clothes. The privacy screen was used by female inmates for privacy when they were unclothed or using the restroom. When uncovered, the window allowed officers to see into her room from the duty officer desk. Similarly, if she stood up in her room, she could see who was at the desk when the window was uncovered. Her room was very close to the duty officer desk, and because it faced directly in that direction, it was very easy to see directly into her room.

c.      During her time at FCI Dublin, Plaintiff Hill covered her window with a privacy screen when changing or using the toilet; otherwise, she kept the window uncovered. Through the entirety of Plaintiff Hill's time at FCI Dublin, however, the officers including Defendant Officer Espinosa working in Unit B regularly and consistently harassed her to take down the privacy screen. Even though they were authorized for use by female inmates per institution policy, the officers working in Plaintiff Hill's unit refused to let her use one.

d.      As a result, when changing or using the toilet, Plaintiff Hill was harassed, berated, and threatened by the guards to take the privacy screen down. This resulted in Plaintiff Hill being seen naked, with her pants down below her ankles, and using the toilet. For example, the officers would say, "Move that paper out of the window right now!" She would replied, "I don't have any clothes on, I am buck naked" or "But I'm using the toilet, I can't remove the screen until I'm done!" The officers said they didn't care and ordered her to move it. They forced her to walk naked, partially clothed, and/or with her pants down around her ankles to the door to remove the privacy screen, and then watch her through the window as she was nude. They were only interested in watching her when she was naked; when Plaintiff Hill covered herself or put clothes on, the officers would leave.

e.    As another example, one day Plaintiff Hill had put up the privacy screen and began to use the toilet. The on-duty officer charged to her door from the duty-station desk and aggressively shouted, "How many times do I need to tell you?! Don't put up anything in that window!" She tried to explain that she was using the bathroom—which should have been enough information for the officer to leave her alone—but he continued yelling so she quickly pulled her pants up and rushed to the window to take down the privacy screen.

f.    Plaintiff Hill is a private person. She used the privacy screen in the course of her normal day when changing or using the restroom. And every day, the officers yelled at her and made her take it down immediately, not letting her put on clothes or clean herself up before. Repeated daily comments included: "Don't tell me you're not moving it. Move that shit right now! The next time I walk back through here, you better not have that shit on there." Plaintiff Hill pleaded with them, responding: "You know what I'm doing, you know I'm either naked or on the toilet. If I'm not on the toilet or naked, the privacy screen won't be up." But the officers did not care, saying: "I don't give a shit. Don't have it up there. I'm not playing with you, this shit better not happen again."

g.    The officers' attention and targeting of Plaintiff Hill was sexual in nature. On information and belief, the officers singled Plaintiff Hill out because they took prurient interest in how she looked and took sexual gratification in seeing her naked body. Before entering FCI Dublin, she had several cosmetic surgeries on her body including breast augmentation and other procedures. Plaintiff Hill's first roommate had used the privacy screen all the time, but the officers did not force her to take it down. They only focused on Plaintiff Hill, ordering her to take down the privacy screen when she was naked or on the toilet, and did so on a daily basis.

h.    The officers involved included Defendant Officer Espinosa as well as a Black/African-American officer (name unknown) and several other

officers whose names are unknown to Plaintiff Hill. The treatment she suffered caused her intense distress, fear, and anguish, frequently leaving her in tears. She prayed on hands and knees at night to leave FCI Dublin because of this treatment.

i.     Plaintiff Hill raised the issue a few times to Officer Espinosa and a few times with the Black or African-American officer and another Hispanic officer. Despite her complaints of mistreatment, nothing was done to protect her. The culture of retaliation, collusion, cover-up, and abuse at FCI Dublin was so pervasive and overwhelming that Plaintiff Hill reasonably believed it was safer to remain quiet than report the abuse she suffered, because the women who had reported misconduct were subjected to retaliatory abuse, harassment, selective enforcement of rules, and punitive imposition of unfair, unjust, and unwarranted punishments including being sent to the Special Housing Unit without due cause.

j.     On information and belief: Defendants received numerous reports of misconduct and complaints of sexual harassment and abuse made by female inmates against the Defendant Officer Espinosa and the other officers whose names are currently unknown to Plaintiff Hill, yet failed to act on those complaints. Defendants knew or should have known of these officers' misconduct but failed to properly investigate, impose discipline, and implement safeguards to ensure the women at FCI Dublin like Plaintiff Hill were protected. Had Defendants properly investigated, intervened, and imposed discipline, and taken other corrective actions as it was legally required to do in response to the complaints, Plaintiff Hill would not have been harmed.

k.     Plaintiff Hill suffered statutory, common law, and constitutional rights violations caused by Defendants' actions and failures to act. Defendants had a duty to keep Plaintiff Hill safe during her period of incarceration and failed to do so. Defendants knew, or should have known, about the abuse she was subjected to and failed to intervene and protect her from the conduct of the other defendants.

Defendants' had a non-delegable duty to act in her best interest given her status as an inmate under their complete control.

l.      The conduct described in this paragraph occurred from Plaintiff Hill's admission into FCI Dublin through the date of her release as described, and harmed her by causing her physical injury and to suffer emotional distress and pain and suffering including but not limited to anxiety, fear, sleeplessness, anger, and intrusive/invasive thoughts on a daily basis. It has also left Plaintiff Hill with loss of consortium as her relationship with her husband has suffered as a result of what she went through and the resulting emotional and psychological trauma.

m.      Plaintiff Hill complied with the Federal Tort Claims Act (FTCA) by submitting a completed claim form to BOP that included the information required by statute and within the time period prescribed by law. Plaintiff Chaney has further satisfied her obligations under the FTCA by filing this complaint within the time limits prescribed by law. A true and correct copy of Plaintiff Hill's tort claim is attached as Exhibit A.

20.    **As to Plaintiff Nichole Robinson:**

a.      Plaintiff Robinson suffered continued sexual harassment during her incarceration at FCI Dublin between July 2019 through November 2020. The sexual harassment was committed by several guards including Defendant Officers Ramos, Salcido, and Smith. On information and belief, Plaintiff Robinson knew the facts stated in ¶¶17 and 18 before, during, and/or after the harms she suffered as described in this paragraph.

b.      Following her admission to FCI Dublin around July 2019, Defendant Officers Ramos and Salcido targeted her for sexual advances, comments, and unwanted physical contact of a sexual nature. They would ask her, "What's up no-hands? Can you do *this* with no hands?" while making hand motions that mimicked oral sex being performed on them. Defendant Officer Salcido "slapped

her on the ass" on one occasion. Sexual harassment of this nature was constant from July 2019 through November 2020 and made Plaintiff Robinson confused, embarrassed, and afraid.

c.    Around March 2020, Plaintiff Robinson was placed in quarantine lockdown due to the Covid-19 pandemic. She had three or four roommates during her time in quarantine, and because she was restricted to her cell almost all of the time, Plaintiff Robinson would do yoga in her room for exercise. Defendant Officer Ramos would come into her room, "put his crotch in her face" as she was laying down doing yoga, suggestively ask "What's going on in here ladies?" Then he would laugh. Defendant Officer Ramos played games with her by calling Plaintiff Robinson on the loudspeaker to report to the duty-officer's desk; when she arrived, he would say, "Oh, I didn't call you." This gaslighting and taunting behavior made Plaintiff Robinson feel unsafe, uncomfortable, targeted, and afraid.

d.    Defendant Officers Ramos, Salcido, and Smith prevented Plaintiff Robinson from using her privacy screen on her window while she was changing and using the toilet. If they were on duty, they would tell her to take it down, saying, "Nothing on the window!" They also bragged to her about how they would go to the restaurant Hooters, which is known for having waitresses with large breasts. These and similar comments were repeated, inappropriate, unwanted, and sexual in nature. On at least one occasion, Defendant Officer Ramos saw the privacy screen was up but entered her room anyway; Plaintiff Robinson was humiliated and afraid because he came in and saw her sitting on the toilet with her pants and underwear down around her ankles and wiping herself.

e.    When Plaintiff Robinson objected to the sexual harassment, the officers made her clean rooms in the prison for two or more hours. As a result, she was afraid to make new complaints or escalate prior complaints about this sexual harassment, which continued to happen regularly during her time at FCI Dublin.

f.     Plaintiff Robinson saw these officers send inmates to the SHU as retaliation when they complained about mistreatment. Therefore, she was afraid to complain or escalate prior complaints because she was afraid of retaliation and what the officers might do to her. Further Assistant Warden Garcia did nothing to stop sexual harassment and misconduct by officers despite inmates including Plaintiff Robinson who complained. As a result, Plaintiff Robinson had no recourse to stop this behavior and was forced to "play along with their little games" or else suffer retribution, retaliation, and possibly being sent to the SHU as punishment for complaining.

g.     Plaintiff Robinson suffered statutory, common law, and constitutional rights violations caused by Defendants' actions and failures to act. Defendants had a duty to keep her safe during the period of her incarceration and failed to do so. Defendants knew, or should have known, about the abuse she was subjected to and failed to intervene and protect her from the conduct of the other defendants. Defendants had a non-delegable duty to act in her best interest given her status as an inmate under the other defendants' complete control.

h.     On information and belief: Defendants received numerous reports of misconduct and complaints of sexual harassment and abuse made against the other defendants, including Defendant Officers Ramos, Salcido, and Smith, yet failed to act on them. Defendants knew or should have known of their misconduct but failed to properly investigate, impose discipline, and implement safeguards to ensure the women at FCI Dublin like Plaintiff Robinson were protected. Had Defendants properly investigated, intervened, and imposed discipline, and taken other corrective actions as it was legally required to do in response to the complaints, she would not have been harmed.

i.     The conduct described in this paragraph injured Plaintiff Robinson by causing her to suffer physical injury and emotional distress and pain

and suffering. Her symptoms include but are not limited to anxiety, fear, sleeplessness, anger, and intrusive/invasive thoughts on a daily basis.

j.      Plaintiff Robinson complied with the Federal Tort Claims Act by submitting a completed claim form to BOP that included the information required by statute and within the time period prescribed by law. Plaintiff Robinson has further satisfied her obligations under the FTCA by filing this complaint within the time limits prescribed by law. A true and correct copy of Plaintiff Robinson's tort claim is attached as Exhibit B.

21.    **As to Plaintiff Charollotte Alarcon:**

a.      Plaintiff Alarcon was incarcerated at FCI Dublin in mid-2020 and was release on or about January 19, 2022. On information and belief, she knew the facts stated in ¶¶17 and 18 before, during, and/or after the harms she suffered as described in this paragraph.

b.      While Plaintiff Alarcon was at FCI Dublin, she was continually subjected to sexual misconduct by officers including repeated inappropriate, offensive, and unwanted comments, gestures, and physical contact. They would "stare her down like a piece of meat." One of the officers, name unknown, entered her room to touch Plaintiff Alarcon and Alarcon's roommate. Another night, he entered Plaintiff Alarcon's room and touched her body while she was in bed. This left her deeply frightened and afraid his sexual touching would escalate and he would "do more," i.e., further sexually molest or assault her. This abuse happened repeatedly during the night while she was at FCI Dublin, which left Plaintiff Alarcon on high alert. She couldn't sleep comfortably, was afraid to fall asleep, and remains unable and afraid to sleep currently because of his "nasty" behavior.

c.      The officer engaged in other inappropriate conduct. For example, he would tell her about the tattoo on his penis, stand in such a way to make

sure Plaintiff Alarcon could see his penis through his pants, and pressured her into sexual behaviors, speech, and inappropriate touching/molestation by saying, "No one will get caught." The officer had sex with other female inmates and brought them gifts after they had sex. Every interaction with him was fraught with danger and loaded with sexual innuendo and harassment. He constantly looked through the window into her room to stare at her, and when she was in the day room outside her room, he would stop whatever he was doing to stare at her wherever she was in the prison. He did this to the point where she became afraid, paranoid, uncomfortable and fearful. Plaintiff Alarcon tried to escape his attention but was unable to do so successfully; as an inmate in a federal correctional facility, she had nowhere to go where she could be free of him. She was a captive victim.

        d.    Plaintiff Alarcon was not only subjected to direct sexual harassment and assault, but also retaliation by FCI Dublin. She was one of many who were sexually abused by officers, and saw how other victims who complained of mistreatment were retaliated against by, among other things: being wrongfully sent to the Special Housing Unit (SHU) to live in isolation without contact with the outside world on the basis of made-up rule violations; transferred to different institutions punitively; and being verbally abused and mocked by other officers. This behavior amounted to a facility-wide policy and practice of retaliation against any female inmate who complained of sexual abuse, starting with the warden at the top of the conspiratorial enterprise.

        e.    Plaintiff Alarcon suffered statutory, common law, and constitutional rights violations caused by Defendants' actions and failures to act. Defendants had a duty to keep her safe during the period of her incarceration and failed to do so. Defendants knew, or should have known, about the abuse she was subjected to and failed to intervene and protect her from the conduct of FCI Dublin's prison guards. Defendants had a non-delegable duty to act in her best

interest given her status as an inmate under Defendants' complete control. On information and belief, Defendants had received numerous complaints of misconduct including sexual assault and harassment committed by the other defendants, including Defendant Smith, prior to the assaults on Plaintiff Garcia but failed to act on those complaints.

f.    The conduct described in this paragraph injured Plaintiff Alarcon by causing her to suffer physical harm and emotional distress and pain and suffering. She has suffered from symptoms including but not limited to anxiety, fear, sleeplessness, anger, and intrusive/invasive thoughts on a daily basis. She is seeing a therapist and takes medication for PTSD and suffers from loss of the ability to engage in healthy physical intimacy.

g.    Plaintiff Alarcon complied with the Federal Tort Claims Act by submitting a completed claim form to BOP that included the information required by statute and within the time period prescribed by law. Plaintiff Alarcon satisfied the FTCA by filing this complaint within the time limits prescribed by law. A true and correct copy of Plaintiff Alarcon's tort claim is attached as Exhibit C.

## **FIRST CAUSE OF ACTION**

VIOLATION OF EIGHTH AMENDMENT

22.    Paragraphs 1 through 18 are incorporated by reference.

23.    Plaintiffs allege cruel and unusual punishment under the Eighth Amendment to the Constitution of the United States of America and the FTCA.

24.    "The Eighth Amendment prohibits cruel and unusual punishment in penal institutions." *Wood v. Beauclair*, 692 F.3d 1041, 1045-1046 (9th Cir. 2012). "The requirements for proving an actionable violation of the Eighth Amendment are well established. First, an inmate must demonstrate that the deprivation suffered was objectively, sufficiently serious. Then, the inmate must establish that prison officials had a sufficiently culpable state of mind in allowing the deprivation

1    to take place. The latter requirement has been defined as being deliberately

2    indifferent to an inmate's health or safety." *Wallis v. Baldwin*, 70 F.3d 1074, 1076

3    (9th Cir. 1995) (cleaned up).

4        25.    "Sexual harassment or abuse of an inmate by a corrections officer is a

5    violation of the Eighth Amendment." *Wood*, *supra.* at 1046. In the Ninth Circuit,

6    forcible sexual contact satisfies these requirements when "a prisoner presents a

7    viable Eighth Amendment claim where he or she proves that a prison staff member,

8    acting under color of law and without legitimate penological justification, touched

9    the prisoner in a sexual manner or otherwise engaged in sexual conduct for the staff

10   member's own sexual gratification, or for the purpose of humiliating, degrading,

11   or demeaning the prisoner. *Bearchild v. Cobban*, 947 F.3d 1130, 1144 (9th Cir.

     2020). "[C]ourts must presume malicious and sadistic intent where there is no

12   legitimate penological purpose for a prison official's conduct." *Anderson v.*

13   *Ferguson* (N.D. Cal., Mar. 14, 2022, 20-cv-04368-HSG) at *15 (citing *Wood*,

14   *supra*, 692 F.3d 1041 at 1050).

15       26.    A prison official violates the Eighth Amendment under the deliberate

16   indifference standard by ignoring risks of serious harm to an inmate's health or

17   safety. Under the deliberate indifference standard, the harm must be objectively

18   serious (*i.e.,* the inmate is incarcerated under conditions posing a substantial risk

19   of serious harm) and the official must be subjectively indifferent to the risk of harm

20   (*i.e.*, the prison official must be aware of facts from which the inference can be

     drawn that a substantial risk of serious harm exists, and must also draw the

     inference). The prison official need not believe harm will occur; it is enough to fail

     to act despite knowledge of substantial risk of serious harm. Knowledge can be

     inferred from the circumstances and can be found when the risk was obvious.

     *Schrubb v. Simmons* (N.D. Cal., Aug. 29, 2022, 12-cv-00418-JSW) at *9 (applying

     *Farmer v. Brennan*, 511 U.S. 825 (1994).)

1    27.    **Plaintiff Hill alleges violations of her Eighth Amendment rights as**

2    **follows:**

3         a.    **Against Defendant Officer Espinosa in his individual**

4    **capacity for sexually harassing her as pleaded in ¶19(c)-(h), without consent**

5    **and against her will, as well as on his failure to prevent serious harm to her**

6    **health and safety.**

7              i.    Paragraph 19 is incorporated by reference.

8              ii.    At all relevant times, Defendant Officer Espinosa was a

9    federal employee of Defendants BOP and USA working at FCI Dublin and acting

10   under color of authority with respect to the allegations in this complaint. Defendant

11   Officer Espinosa was a correctional officer responsible for the safekeeping and

12   protection of Plaintiff Hill who was an inmate under his care.

13             iii.    Defendant Officer Espinosa violated Plaintiff Hill's

14   rights to be free from cruel and unusual punishment by repeatedly sexually

15   harassing her while she was incarcerated as an inmate at FCI Dublin.

16             iv.    The sexual abuse occurred under inherently coercive

17   circumstances; there were no legitimate penological purposes for this conduct and

18   Defendant Officer Espinosa did so for sexual gratification and/or to humiliate,

19   degrade, and/or demean Plaintiff Hill in conscious violation of her constitutional

20   rights.

             v.    By intentionally subjecting Plaintiff Hill to sexual

harassment, Defendant Officer Espinosa acted maliciously, in a manner deeply

offensive to human dignity, and void of any penological justification. Defendant

Officer Espinosa's actions fell so far below the acceptable standard of custodial

conduct that he could not have been making a policy judgment in his decision to

sexually harass her.

vi.       By repeatedly subjecting Plaintiff Hill to sexual harassment, Defendant Officer Espinosa caused her to suffer physical, mental, and emotional injuries, as well as injuries to her personal dignity. Defendant Officer Espinosa acted with malice and oppression, and his conduct constituted a reckless or callous disregard of Plaintiff Hill's rights, entitling her to punitive damages.

vii.       The inhumane conditions of confinement caused by Defendant Officer Espinosa's repeated sexual abuse caused Plaintiff Hill physical, mental, and emotional harm. She was harmed by this conduct as stated in ¶19(l). She complied with the FTCA as stated in ¶19(m).

28.    **Plaintiff Robinson alleges violations of her Eighth Amendment rights as follows:**

a.       **Against Defendant Officer Ramos in his individual capacity for repeated sexual harassment, comments, and unwanted physical contact as pleaded in ¶20 and for failing to protect her from a substantial risk of serious harm from sexual abuse by acting in conscious disregard of that known risk.**

i.       Paragraph 20 is incorporated by reference.

ii.       At all relevant times, Defendant Officer Ramos was a federal employee of Defendants BOP and USA working at FCI Dublin and acting under color of authority with respect to the allegations in this complaint. Defendant Officer Ramos was a correctional officer responsible for the safekeeping and protection of Plaintiff Robinson who was an inmate under his care.

iii.       Defendant Officer Ramos violated Plaintiff Robinson's rights to be free from cruel and unusual punishment by repeatedly sexually abusing her and failing to protect her from sexual abuse while she was incarcerated as an inmate at FCI Dublin.

iv.       The sexual abuse occurred under inherently coercive circumstances; there were no legitimate penological purposes for this conduct and

Defendant Officer Ramos did so for sexual gratification and/or to humiliate, degrade, and/or demean Plaintiff Robinson.

        v.      By intentionally subjecting Plaintiff Robinson to sexual harassment, Defendant Officer Ramos acted maliciously, in a manner deeply offensive to human dignity, and void of any penological justification. Defendant Officer Ramos's actions fell so far below the acceptable standard of custodial conduct that he could not have been making a policy judgment in his decision to sexually assault her.

        vi.      By repeatedly subjecting Plaintiff Robinson to sexual harassment, Defendant Officer Ramos caused her to suffer physical, mental, and emotional injuries, as well as injuries to her personal dignity. She was harmed as stated in ¶20(i). Defendant Officer Ramos acted with malice and oppression, and his conduct constituted a reckless or callous disregard of Plaintiff's rights, entitling her to punitive damages. She complied with the FTCA as stated in ¶20(j).

      **b.**     **Against Defendant Officer Salcido in his individual capacity for repeated sexual harassment, comments, and unwanted physical contact as pleaded in ¶20 and for failing to protect her from a substantial risk of serious harm from sexual abuse by acting in conscious disregard of that known risk.**

        i.      Paragraph 20 is incorporated by reference.

        ii.      At all relevant times, Defendant Officer Salcido was a federal employee of Defendants BOP and USA working at FCI Dublin and acting under color of authority with respect to the allegations in this complaint. Defendant Officer Salcido was a correctional officer responsible for the safekeeping and protection of Plaintiff Robinson who was an inmate under his care.

        iii.      Defendant Officer Salcido violated Plaintiff Robinson's rights to be free from cruel and unusual punishment by repeatedly sexually abusing

her and failing to protect her from sexual abuse while she was incarcerated as an inmate at FCI Dublin.

       iv.     The sexual harassment occurred under inherently coercive circumstances; there were no legitimate penological purposes for this conduct and Defendant Officer Salcido did so for sexual gratification and/or to humiliate, degrade, and/or demean Plaintiff Robinson.

       v.     By intentionally subjecting Plaintiff Robinson to sexual harassment, Defendant Officer Ramos acted maliciously, in a manner deeply offensive to human dignity, and void of any penological justification. Defendant Officer Ramos's actions fell so far below the acceptable standard of custodial conduct that he could not have been making a policy judgment in his decision to sexually assault her.

       vi.     By repeatedly subjecting Plaintiff Robinson to sexual harassment, Defendant Officer Ramos caused her to suffer physical, mental, and emotional injuries, as well as injuries to her personal dignity. She was harmed as stated in ¶20(i). Defendant Officer Ramos acted with malice and oppression, and his conduct constituted a reckless or callous disregard of Plaintiff's rights, entitling her to punitive damages. She complied with the FTCA as stated in ¶20(j).

      **c.**    **Against Defendant Officer Smith in his individual capacity for repeated sexual harassment, comments, and unwanted physical contact as pleaded in ¶20 and for failing to protect her from a substantial risk of serious harm from sexual abuse by acting in conscious disregard of that known risk.**

       i.     Paragraph 20 is incorporated by reference.

       ii.     At all relevant times, Defendant Officer Smith was a federal employee of Defendants BOP and USA working at FCI Dublin and acting under color of authority with respect to the allegations in this complaint. Defendant

Officer Smith was a correctional officer responsible for the safekeeping and protection of Plaintiff Robinson who was an inmate under his care.

iii.      Defendant Officer Smith violated Plaintiff Robinson's rights to be free from cruel and unusual punishment by repeatedly sexually abusing her and failing to protect her from sexual abuse while she was incarcerated as an inmate at FCI Dublin.

iv.      The sexual harassment occurred under inherently coercive circumstances; there were no legitimate penological purposes for this conduct and Defendant Officer Smith did so for sexual gratification and/or to humiliate, degrade, and/or demean Plaintiff Robinson.

v.      By intentionally subjecting Plaintiff Robinson to sexual harassment, Defendant Officer Smith acted maliciously, in a manner deeply offensive to human dignity, and void of any penological justification. Defendant Officer Ramos's actions fell so far below the acceptable standard of custodial conduct that he could not have been making a policy judgment in his decision to sexually assault her.

vi.      By repeatedly subjecting Plaintiff Robinson to sexual harassment, Defendant Officer Smith caused her to suffer physical, mental, and emotional injuries, as well as injuries to her personal dignity. She was harmed as stated in ¶20(i). Defendant Officer Smith acted with malice and oppression, and his conduct constituted a reckless or callous disregard of Plaintiff's rights, entitling her to punitive damages. She complied with the FTCA as stated in ¶20(j).

29.    **Plaintiff Alarcon alleges violations of her Eighth Amendment rights as follows:**

a.      **Against Defendant Officer DOE 1 in his individual capacity for repeatedly and forcibly touching her body and sexually harassing her as**

**pleaded in ¶21(b) and (C) and additionally, for his failure to protect her from serious risk of harm.**

i.       Paragraph 21 is incorporated by reference.

ii.       At all relevant times, Defendant Officer DOE 1 was a federal employee of BOP working at FCI Dublin and acting under color of authority with respect to the allegations in this complaint. Defendant DOE 1 was a correctional officer responsible for the safekeeping and protection of Plaintiff Alarcon who was an inmate under his care.

iii.       Defendant Officer DOE 1 violated Plaintiff Alarcon's rights to be free from cruel and unusual punishment by repeatedly sexually harassing her while she was incarcerated as an inmate at FCI Dublin.

iv.       The sexual harassment occurred under inherently coercive circumstances; there were no legitimate penological purposes for this conduct; and Defendant Officer DOE 1 did so for sexual gratification and/or to humiliate, degrade, and/or demean Plaintiff Alarcon.

v.       By intentionally subjecting Plaintiff Alarcon to sexual acts, Defendant Officer DOE 1 acted maliciously, in a manner deeply offensive to human dignity, and void of any penological justification. Defendant's actions fell so far below the acceptable standard of custodial conduct that he could not have been making a policy judgment in his decision to sexually assault her.

vi.       By repeatedly subjecting Plaintiff Alarcon to sexual harassment, Defendant Officer DOE 1 caused her to suffer physical, mental, and emotional injuries, as well as injuries to her personal dignity. Defendant Officer DOE 1 acted with malice and oppression, and his conduct constituted a reckless or callous disregard of Plaintiff Alarcon's rights, entitling her to punitive damages.

vii.       The inhumane conditions of confinement caused by Defendant Officer DOE 1's repeated sexual abuse caused Plaintiff severe physical,

mental, and emotional harm. She was harmed by this conduct as stated in ¶21(f). She satisfied the FTCA as stated in ¶21(g).

30.     As pleaded in ¶¶1-21, the defendants, including Defendant Officers Espinosa, Ramos, Salcido, and Smith, acted with deliberate indifference and/or malice and oppression and reckless or callous disregard of Plaintiffs' rights, entitling Plaintiffs to punitive damages. *See Smith v. Wade*, 461 U.S. 30 (1983).

31.     Plaintiffs seek actual damages, compensatory damages, punitive damages, attorney fees and costs, as well as any other remedies provided by law including penalties, interest, and equitable relief as the court deems just.

## SECOND CAUSE OF ACTION

### SEXUAL BATTERY

32.     Paragraphs 1 through 18 are incorporated by reference.

33.     Plaintiffs allege sexual battery under California common law, California Civil Code §1708.5, and the FTCA.

34.     Under California law, a civil cause of action for sexual battery will lie when, *inter alia*, a defendant acts with the intent to cause harmful or offensive contact with a plaintiff using an "intimate part" of either's body, and such contact directly or indirectly results. Cal. Civ. Code §1708.5(a)(1)-(2). Intimate part means "the sexual organ, anus, groin, or buttocks of any person, or the breast of a female; offensive contact means "contact that offends a reasonable sense of personal dignity." *Id.* at (d)(1)-(2). "A person who commits a sexual battery upon another is liable to that person for damages, including, but not limited to, general damages, special damages, and punitive damages." *Id.* at (b).

35.     An employer is liable for an employee's sexual battery committed while working—including liability for punitive damages—if the employer ratifies the employee's misconduct. *Andrade v. Arby's Rest. Grp., Inc.*, 225 F.Supp.3d 1115, 1130 (N.D. Cal. 2016). The theory of ratification generally applies when an

employer fails to investigate or respond to charges that an employee committed an intentional tort, and this establishes independent employer misconduct which is actionable separate and apart from the employee's liability. " 'If the employer, after knowledge of or opportunity to learn of the agents misconduct, continues the wrongdoer in service, the employer may become an abettor and may make himself liable in punitive damages.' " *Id.* (citing *Murillo v. Rite Stuff Foods, Inc.*, 65 Cal.App.4th 833, 852 (1998).)

36.    **Plaintiff Robinson alleges sexual battery as follows:**

a.    Paragraph 20 is incorporated by reference.

b.    Against Defendant Officer Salcido in his individual capacity for intentionally causing harmful and offensive contact when he touched her buttocks in conjunction with continuous, repeated, sexual harassment as pleaded in ¶20(b).

c.    Against Defendant Officer Ramos in his individual capacity for intentionally causing harmful and offensive contact by repeatedly placing his groin in her face as pleaded in ¶20(c).

d.    Against Defendants USA, BOP, and DOES 1 through 20 based on respondeat superior for creating, allowing, and/or knowingly permitting a culture of abuse as pleaded in ¶¶17 and 18, and under the theory of ratification for ratifying Defendant Officers Salcido and Ramos's misconduct at work by failing to act on complaints against them for sexual harassment and assault as pleaded in ¶¶20(h). These defendants have waived sovereign immunity under the FTCA for this cause of action because it is based on assault/battery. 28 U.S.C. §2680(h).

37.    **Plaintiff Alarcon alleges sexual battery as follows:**

a.    Paragraph 21 is incorporated by reference.

b.    Against Defendant Officer DOE 1 in his individual capacity for intentionally causing harmful and offensive contact by coming into her room at night to touch her body as pleaded in ¶21(b) and (c).

c.    Against Defendants USA, BOP, and DOES 1 through 20 based on the doctrine of respondeat superior for creating, allowing, and/or knowingly permitting a culture of abuse as pleaded in ¶¶17 and 18, and under the theory of ratification for ratifying Defendant Officer DOE 1's misconduct—as well as the other unidentified officers who participated in the harassment of Plaintiff Alarcon—at work by failing to act on complaints made against them for sexual harassment and assault as pleaded in ¶¶21(d) and (e). Defendants have waived sovereign immunity under the FTCA because this claim is based on assault/battery. 28 U.S.C. §2680(h).

38.    Plaintiffs seek actual damages, compensatory damages, punitive damages, attorney fees and costs, as well as any other remedies provided by law including penalties, interest, and equitable relief as the court deems just.

### THIRD CAUSE OF ACTION

GENDER VIOLENCE

39.    Paragraphs 1 through 18 are incorporated by reference into each paragraph in this cause of action.

40.    Plaintiffs allege gender violence under California Civil Code §52.4 and the FTCA. *See also* Cal. Pen. Code §243.4(a).

41.    "Any person who has been subjected to gender violence may bring a civil action for damages against any responsible party. The plaintiff may seek actual damages, compensatory damages, punitive damages, injunctive relief, any combination of those, or any other appropriate relief. A prevailing party may also be awarded attorney's fees and costs." Cal. Civ. Code §52.4(a).

42.    Gender violence "is a form of sex discrimination and means either of the following: (1) One or more acts that would constitute a criminal offense under state law that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, committed at least in part based on

the gender of the victim, whether or not those acts have resulted in criminal complaints, charges, prosecution, or conviction. (2) A physical intrusion or physical invasion of a sexual nature under coercive conditions, whether or not those acts have resulted in criminal complaints, charges, prosecution, or conviction." *Id.* at §52.4(c).

43.    A violation of California Penal Code §243.4 meets the definition of Civil Code §52.4(c)(1) because it defines the elements of criminal sexual battery as follows: "Any person who touches an intimate part of another person while that person is unlawfully restrained by the accused or an accomplice, and if the touching is against the will of the person touched and is for the purpose of sexual arousal, sexual gratification, or sexual abuse, is guilty of sexual battery." Cal. Pen. Code §243.4(a).

44.    **Plaintiff Robinson alleges gender violence as follows:**

a.    Paragraph 20 is incorporated by reference.

b.    Against Defendant Officer Salcido in his individual capacity for intentionally causing harmful and offensive contact when he touched Plaintiff Robinson's buttocks in conjunction with continuous, repeated, sexual harassment as pleaded in ¶20(b).

c.    Against Defendant Officer Ramos in his individual capacity for intentionally causing harmful and offensive contact by repeatedly placing his groin in Plaintiff Robinson's face as pleaded in ¶20(c).

d.    Against Defendants USA, BOP, and DOES 1 through 20 based on the doctrine of respondeat superior as pleaded in ¶¶17, 18, and 20 (h). These defendants have waived sovereign immunity under the FTCA for this cause of action because it is based on assault/battery. 28 U.S.C. §2680(h).

45.    **Plaintiff Alarcon alleges gender violence as follows:**

a.    Paragraph 21 is incorporated by reference.

b.     Against Defendant Officer DOE 1 in his individual capacity for intentionally causing harmful and offensive contact by coming into Plaintiff Alarcon's room at night to touch her body as pleaded in ¶21(b) and (c).

c.     Against Defendants USA, BOP, and DOES 1 through 20 based on the doctrine of respondeat superior as pleaded in ¶¶17, 18, and 22(h). These defendants have waived sovereign immunity under the FTCA for this cause of action because it is based on assault/battery. 28 U.S.C. §2680(h).

46.    Defendants acted with malice and oppression and reckless or callous disregard of Plaintiffs' rights, entitling Plaintiffs to punitive damages, as supported by the specific factual allegations in ¶1-18.

47.    Plaintiffs seek actual damages, compensatory damages, punitive damages, attorney fees and costs, as well as any other remedies provided by law including but not limited to penalties, interest, and equitable relief as the court deems just.

### FOURTH CAUSE OF ACTION

CIVIL CONSPIRACY

48.    Paragraphs 1 through 47 are incorporated by reference.

49.    Plaintiffs Hill, Robinson, and Alarcon allege civil conspiracy against all defendants based on California common law and the FTCA.

50.    "The elements of an action for civil conspiracy are (1) formation and operation of the conspiracy and (2) damage resulting to the plaintiff (3) from a wrongful act done in furtherance of the common design." *Rusheen v. Cohen*, 37 Cal.4th 1048, 1062 (2006). A civil conspiracy claim is simply a mechanism for imposing vicarious liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in it perpetration; it is not itself a substantive basis for liability. *Favila v. Katten Muchin Rosenman LLP*, 188 Cal.App.4th 189, 206 (2010). Before liability can be

COMPLAINT

imposed, therefore, a duty must be owed by the co-conspirator to the plaintiff as the doctrine of conspiracy does not impose liability on persons who owe no duty or who are otherwise immune from liability. *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503, 520 (1994).

51.    As set forth in extensive detail in ¶¶17-18, the defendants in this case colluded to perpetrate a culture of sexual violence against the female inmates at FCI Dublin over many years and did so in a manner to prevent the outside world from discovering their misdeeds. The conspiracy started at the top with the warden, and continued down the chain of command to permeate every aspect of life at FCI Dublin while Plaintiffs were incarcerated there.

52.    On information and belief, an agreement among and between the defendants existed with respect to the wrongful acts done in furtherance of their common design. The existence of collusion, cover-up, and conspiracy is evidenced from the extent, duration, and severity of the abuse the inmates suffered before those wrongs were discovered.

53.    As set forth in ¶17-18, the defendants preyed on a vulnerable population of women to whom they owed the highest duty of care. Inmates are wards of the state and exist at the sufferance and goodwill of the government while in custody, and depend on the government and all of its agents and employees to ensure they are safe and their basic needs are met. Defendants owed Plaintiffs a duty of care but breached that duty by engaging in a common plan or design to subject them to sex-based abuse, assault, harassment, and retaliation.

54.    Defendants' conduct, and all of it, satisfies the standard for wrongful acts because, as pleaded *inter alia* in the First, Second, and Third Causes of Action, the defendants committed both civil torts and criminal acts. Because assault and battery form the underlying wrongful torts upon which Plaintiffs' cause of action for civil conspiracy springs, this claim falls within the federal government's waiver

of sovereign immunity with respect to "acts or omissions of investigative or law enforcement officers of the United States Government… arising… out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution." 28 U.S.C. §2680(h).

55.    As set forth in ¶¶17, 18, 19, 20 and 21, the defendants acted with malice, oppression, and/or fraud with respect to the allegations in this complaint, entitling Plaintiffs to punitive damages.

56.    As set forth in ¶¶19, 20, and 21, Plaintiffs were harmed by the defendants' conduct and suffered and continue to suffer damages as a result, and satisfied the FTCA as pleaded in those paragraphs, respectively.

57.    Plaintiffs seek actual damages, compensatory damages, punitive damages, attorney fees and costs, as well as any other remedies provided by law including but not limited to penalties, interest, and equitable relief as the court deems just.

## FIFTH CAUSE OF ACTION

### BATTERY

58.    Paragraphs 1 through 18 are incorporated by reference.

59.    This claim is brought under California common law.

60.    **Plaintiff Robinson alleges battery as follows:**

a.    Paragraph 20 is incorporated by reference.

b.    Against Defendant Officer Salcido in his individual capacity for intentionally causing harmful and offensive contact when he touched her buttocks in conjunction with continuous, repeated, sexual harassment as pleaded in ¶20(b).

c.    Against Defendant Officer Ramos in his individual capacity for intentionally causing harmful and offensive contact by repeatedly placing his groin in her face as pleaded in ¶20(c).

d.     Against Defendants USA, BOP, and DOES 1 through 20 based on respondeat superior for creating, allowing, and/or knowingly permitting a culture of abuse as pleaded in ¶¶17 and 18, and under the theory of ratification for ratifying Defendant Officers Salcido and Ramos's misconduct at work by failing to act on complaints against them for sexual harassment and assault as pleaded in ¶¶20(h). These defendants have waived sovereign immunity under the FTCA for this cause of action because it is based on assault/battery. 28 U.S.C. §2680(h).

61.     **Plaintiff Alarcon alleges sexual battery as follows:**

a.     Paragraph 21 is incorporated by reference.

b.     Against Defendant Officer DOE 1 in his individual capacity for intentionally causing harmful and offensive contact by coming into her room at night to touch her body as pleaded in ¶21(b) and (c).

c.     Against Defendants USA, BOP, and DOES 1 through 20 based on the doctrine of respondeat superior for creating, allowing, and/or knowingly permitting a culture of abuse as pleaded in ¶¶17 and 18, and under the theory of ratification for ratifying Defendant Officer DOE 1's misconduct—as well as the other unidentified officers who participated in the harassment of Plaintiff Alarcon—at work by failing to act on complaints made against them for sexual harassment and assault as pleaded in ¶¶21(d) and (e). Defendants have waived sovereign immunity under the FTCA because this claim is based on assault/battery. 28 U.S.C. §2680(h).

62.     Defendants acted with malice and oppression and reckless or callous disregard of Plaintiffs' rights, entitling Plaintiffs to punitive damages, as supported by the specific factual allegations in ¶1-18.

63.     Plaintiffs seek actual damages, compensatory damages, punitive damages, attorney fees and costs, as well as any other remedies provided by law including penalties, interest, and equitable relief as the court deems just.

## SIXTH CAUSE OF ACTION

NEGLIGENCE

64.     Paragraphs 1 through 18 are incorporated by reference.

65.     Plaintiffs allege negligence under California common law and the FTCA as set forth below.

66.     Jailers owe a duty of care to prisoners under state tort law. California case law holds that there is a special relationship between jailer and prisoner, imposing on the former a duty of care to the latter. *Schrubb v. California* 22-cv-00266-EJD (N.D. Cal. May 31, 2022) at *6-7 (citing *Lawson v. Superior Court*, 168 Cal.App.4th 231, 250 (2010).)

67.     Defendant Officers Espinosa, Ramos, Salcido, Smith and DOE 1 owed special and heightened duties of care to Plaintiffs as their jailers, and those duties required them to protect Plaintiffs against reasonably foreseeable harm including sexual abuse. Alternatively, Defendants owed a general duty of care with respect to the Plaintiffs.

68.     Defendants breached their duties of care to Plaintiff, and such breaches caused Plaintiffs harm.

69.     **Plaintiff Hill alleges negligence as follows:**

a.     **Against Defendant Officer Espinosa individually for breaching his duty of care to Plaintiff by repeatedly subjecting her to sexual harassment and failing to protect her from sexual harassment as pleaded in ¶19.** Reasonably prudent prison guards would not have engaged in that conduct. By repeatedly subjecting Plaintiff Hill to sexual acts, Defendant Officer Espinosa proximately caused her to suffer physical, mental, and emotional injuries, as well as injuries to her personal dignity. Defendant Officer Espinosa's conduct lacked any penological justification, and their actions were so far below the acceptable standard of custodial conduct, as exemplified by PREA regulations and BOP policy

prohibiting sexual abuse, that they could not have been making a policy judgment in sexually abusing and/or ratifying the sexual abuse of Plaintiff.

        **b.**    **Against the United States, BOP, and FCI Dublin under the FTCA based on the acts and/or omissions of Defendant Officer Espinosa acting in his capacity as an employee of BOP and within the scope of said employment, with the permission and consent and ratification of Defendants United States, BOP, and FCI Dublin.**

        i.    Defendants including Defendant Officer Espinosa owed custodial duties, as well as mandatory statutory obligations under PREA and BOP policies, to protect Plaintiff Hill as an inmate incarcerated by the United States from foreseeable harm including harm from sexual abuse. In the alternative, they owed a general duty of care to Plaintiff Hill.

        ii.    Defendant Officer Espinosa's sexual abuse of Plaintiff Hill was reasonably foreseeable to decision-makers at FCI Dublin, BOP and the United States because their conduct made plain he were abusing her, and based on prior knowledge of prior similar complaints.

        iii.    Defendants United States, BOP, and FCI Dublin failed to supervise and operate FCI Dublin in a manner that would have prevented the ongoing sexual abuse of Plaintiff Hill. These defendants did not take reasonable, available measures to abate the risk of harm to Plaintiff Hill and to guarantee her safety, even though a reasonable administrator would have complied with PREA regulations regarding prison operations including adequately monitoring officer conduct and responding to complaints of prior misconduct.

        iv.    Defendant Officer Espinosa's sexual abuse of Plaintiff Hill occurred as the direct and proximate result of the supervisory negligence of Defendants United States, BOP, and FCI Dublin.

c.      Defendants caused Plaintiff physical violation, injuries to personal dignity, prior physical injury, past and future mental pain and suffering, emotional distress, and other injuries.

d.      Defendants acted with malice and oppression and reckless or callous disregard of Plaintiff Hill's rights, entitling Plaintiff Hill to punitive damages, as supported by the specific factual allegations in ¶¶1-19.

e.      Plaintiff Hill seeks damages resulting from the repeated violations of her personal dignity and from physical injury; non-economic damages consisting of past physical injury, past and future mental pain and suffering, mental anguish, emotional distress, and for offenses to her personal dignity; and punitive damages.

70.    **Plaintiff Robinson alleges negligence as follows:**

a.      **Against Defendant Officers Ramos, Salcido, and Smith individually for breaching their duties of care to Plaintiff Robinson by repeatedly subjecting her to sexual harassment, comments, and unwanted physical contact and for failing to protect her from sexual harassment as pleaded in ¶20.** Reasonably prudent prison guards would not have engaged in such conduct. Defendants' conduct lacked any penological justification, and their actions were so far below the acceptable standard of custodial conduct, as exemplified by PREA regulations and BOP policy prohibiting sexual abuse, that they could not have been making a policy judgment in sexually abusing and/or ratifying the sexual abuse of Plaintiff. By repeatedly subjecting Plaintiff to sexual harassment and failing to protect her from sexual harassment, Defendants proximately caused her to suffer physical, mental, and emotional injuries, as well as injuries to her personal dignity.

b.      **Against the United States, BOP, and FCI Dublin under the FTCA based on the acts and/or omissions of Defendant Officers Ramos,**

**Salcido, and Smith acting in their capacities as employees of BOP and within the scope of said employment, with the permission and consent and ratification of Defendants United States, BOP, and FCI Dublin.**

      i.      The defendants, including Defendant Officers Ramos and Salcido, owed custodial duties, as well as mandatory statutory obligations under PREA and BOP policies, to protect Plaintiff as an inmate incarcerated by the United States from foreseeable harm including harm from sexual harassment. In the alternative, they owed a general duty of care to Plaintiff.

      ii.      Defendant Officers Ramos, Salcido, and Smith's sexual harassment of Plaintiff was reasonably foreseeable to decision-makers at FCI Dublin, BOP and the United States because their conduct made plain they were abusing her, and based on prior knowledge of prior complaints.

      iii.      Defendants United States, BOP, and FCI Dublin failed to supervise and operate FCI Dublin in a manner that would have prevented the ongoing sexual harassment of Plaintiff. The defendants did not take reasonable, available measures to abate the risk of harm to Plaintiff and to guarantee her safety, even though a reasonable administrator would have complied with PREA regulations regarding prison operations including adequately monitoring officer conduct and responding to complaints of prior misconduct.

      iv.      The sexual harassment suffered by Plaintiff occurred as the direct and proximate result of the supervisory negligence of Defendants United States, BOP, and FCI Dublin.

      c.      Defendants caused Plaintiff physical violation, injuries to personal dignity, prior physical injury, past and future mental pain and suffering, emotional distress, and other injuries.

d.    Defendants acted with malice and oppression and reckless or callous disregard of Plaintiffs' rights, entitling Plaintiffs to punitive damages, as supported by the specific factual allegations in ¶1-18.

e.    Plaintiff seeks damages resulting from the repeated violations of her personal dignity and from physical injury; non-economic damages consisting of past physical injury, past and future mental pain and suffering, mental anguish, emotional distress, and for offenses to her personal dignity; and punitive damages.

71.    **Plaintiff Alarcon alleges negligence as follows:**

a.    **Against Defendant Officer DOE 1 individually for breaching his duty of care to Plaintiff by repeatedly subjecting her to sexual harassment and failing to protect her from sexual harassment as pleaded in ¶21.** A reasonably prudent prison guard would not have engaged in that conduct. Defendant's conduct lacked any penological justification, and his actions were so far below the acceptable standard of custodial conduct, as exemplified by PREA regulations and BOP policy prohibiting sexual abuse, that they could not have been making a policy judgment in sexually abusing and/or ratifying the sexual abuse of Plaintiff. By repeatedly subjecting Plaintiff to sexual harassment, Defendant proximately caused her to suffer physical, mental, and emotional injuries, as well as injuries to her personal dignity.

b.    **Against the United States, BOP, and FCI Dublin under the FTCA based on the acts and/or omissions of its officers including Defendant Officer DOE 1 who were acting in their capacities as employees of BOP and within the scope of said employment, with the permission and consent and ratification of Defendants United States, BOP, and FCI Dublin.**

i.    The defendants' officers, including Defendant Officer DOE 1 owed custodial duties, as well as mandatory statutory obligations under PREA and BOP policies, to protect Plaintiff as an inmate incarcerated by the United

States from foreseeable harm including harm from sexual abuse. In the alternative, he owed a general duty of care to Plaintiff.

ii.     Defendant Officer DOE 1's sexual harassment of Plaintiff was reasonably foreseeable to decision-makers at FCI Dublin, BOP and the United States because his conduct made plain he was abusing her, and based on prior knowledge of prior complaints made against him and known to the defendants.

iii.     Defendants United States, BOP, and FCI Dublin failed to supervise and operate FCI Dublin in a manner that would have prevented the ongoing sexual abuse of Plaintiff. These defendants did not take reasonable, available measures to abate the risk of harm to Plaintiff and to guarantee her safety, even though a reasonable administrator would have complied with PREA regulations regarding prison operations including adequately monitoring officer conduct and responding to complaints of prior misconduct.

iv.     Defendant Officer DOE 1's sexual abuse of Plaintiff occurred as the direct and proximate result of the supervisory negligence of Defendants United States, BOP, and FCI Dublin.

c.     Defendants acted with malice and oppression, in reckless or callous disregard of Plaintiff's rights, making her entitled to punitive damages.

d.     Plaintiff seeks nominal damages resulting from the repeated violations of her personal dignity and from physical injury; non-economic damages consisting of past physical injury, past and future mental pain and suffering, mental anguish, emotional distress, and for offenses to her personal dignity; and punitive damages.

//

//

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that this Court grant the following relief:

1.    Nominal damages in an amount to be determined at trial;

2.    Compensatory damages for injuries caused by a violation of
      her constitutional rights and personal dignity, physical injury,
      pain, discomfort, fears, anxiety, and other mental and
      emotional distress suffered by Plaintiffs and for similar
      suffering reasonably certain to be experienced in the future, in
      an amount to be determined at trial;

3.    Punitive damages for malice, oppression, and reckless and
      callous disregard of Plaintiffs' rights;

4.    An award to Plaintiffs of reasonable costs and fees; and

5.    Such other and further relief as the Court may deem fit and proper.

Dated: 10/19/2023                       Respectfully submitted,

                                        NICHOLAS J.P. WAGNER
                                        Counsel for Plaintiffs

COMPLAINT